UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WEDI CORP., an Illinois corporation,

Plaintiff,

v.

HYDROBLOK GRAND INTERNATIONAL
LTD., a Canadian corporation; HYDROBLOK
GRAND INTERNATIONAL INC., a Nevada
corporation; and HYDRO-BLOK USA LLC, a
Washington limited liability company,

Defendants.

C23-0452 TSZ

ORDER

THIS MATTER comes before the Court on a motion brought by plaintiff wedi

Corp. ("wedi"), docket no. 57, to retransfer this action back to the District of Nevada,

where it began. wedi contends that this litigation must be returned to Nevada because the

Western District of Washington is not a judicial district in which this case originally

might have been brought or to which it could have been transferred for "the convenience

of the parties and witnesses" and "in the interest of justice." *See* 28 U.S.C. § 1404(a).[1]

The parties were permitted to conduct limited discovery, *see* Order at 11 (docket no. 68),

---

[1] The Court previously concluded that the case could not have been transferred to this district
pursuant to 28 U.S.C. § 1406 because Nevada was a proper venue. *See* Order at 5–6 (docket
no. 68). The Court also decided that the transfer of this matter based on the first-to-file rule was
inconsistent with Ninth Circuit jurisprudence. *Id.* at 6–7.

ORDER - 1

1   and they have submitted supplemental briefs, docket nos. 90, 91, 103, & 104,[2] as well as

2   various declarations with exhibits.  Having reviewed all papers filed in support of, and in

3   opposition to, the pending motion, the Court now enters the following Order.

4   **Discussion**

5       The procedural history of this dispute is set forth in the Court's previous Order,

6   docket no. 68, which is incorporated by reference.  The question now before the Court is

7   whether, at the time this case was transferred from the District of Nevada, all defendants

8   were "residents" of the same state, namely Washington, for purposes of determining

9   proper venue.[3]  *See* 28 U.S.C. § 1391(b)(1).  The parties do not dispute that defendant

10

11

12   [2] wedi also filed a surreply, docket no. 106, asking the Court to strike portions of defendants'
rebuttal brief, docket no. 103, that (for the first time) raised an alter ego theory.  As explained

13   later, the Court has rejected defendants' unsupported corporate-veil-piercing argument, and
wedi's motion to strike is therefore DENIED as moot.  wedi's request, docket no. 90, that the

14   Court disregard any affidavit submitted by Peter Chen and his verification of interrogatory
answers is also DENIED as moot because no such affidavit was filed and the verification form
was not signed, *see* Kanter Decl. at ¶ 4 & Ex. C (docket nos. 92 & 94).

15

16   [3] If this action could not have been brought in the Western District of Washington, then transfer
was improper and this matter must be returned to the District of Nevada, in which venue lies.
*See* 28 U.S.C. §§ 1391(b)(1), 1391(c)(3), & 1404(a).  Defendants observe that lack of venue

17   and/or personal jurisdiction are waivable defenses.  *See* Defs.' Rebuttal at 2 (docket no. 103).
The Supreme Court has, however, made clear that "the power of a District Court under § 1404(a)

18   to transfer an action to another district is made to depend ***not*** upon the wish or waiver of the
defendant but, rather, upon whether the transferee district was one in which the action 'might

19   have been brought' by the plaintiff."  *Hoffman v. Blaski*, 363 U.S. 335, 343–44 (1960) (emphasis
added).  As the parties that moved for a transfer, defendants bear the burden of demonstrating

20   that the § 1404(a) criteria have been met.  *See Le v. Zuffa, LLC*, 108 F. Supp. 3d 768, 774 (N.D.
Cal. 2015) (citing *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir.

21   1979)).  With respect to wedi's motion to retransfer the matter, the Court may consider evidence
outside the pleadings, but all reasonable inferences must be drawn, and any factual conflicts must
be resolved, in favor of wedi, as the party opposing defendants' original motion to transfer.  *See*

22   *Fluence Energy, LLC v. M/V BBC Finland*, 584 F. Supp. 3d 878, 886 (S.D. Cal. 2022).

23

ORDER - 2

1  Hydro-Blok USA LLC (referred to by the parties as "HB USA" or "Hydroblok USA,"

2  but abbreviated in this Order as "HB-Washington"), which is a Washington limited

3  liability company with its principal place of business in Washington,[4] is a resident of

4  Washington within the meaning of the venue statute.  The parties also agree that the

5  residency of defendant Hydroblok Grand International Ltd. ("HB-Canada"), which is a

6  Canadian company, should be "disregarded in determining where the action may be

7  brought with respect to other defendants."  _Id._ at § 1391(c)(3).  The parties, however,

8  express opposite views concerning the residency of the only other defendant, Hydroblok

9  Grand International Inc. ("HB-Nevada"), which is a Nevada corporation with a principal

10  place of business in Missouri.  _See_ Compl. at ¶ 5 (docket no. 1); _see also_ Dunn[5] Decl. at

11  ¶ 17 (docket no. 89) (indicating that HB-Nevada does not maintain a physical office in

12  Nevada); Dunn Dep. at 85:24–87:4, Ex. D to Kanter Decl. (docket nos. 88-4 & 95)

13  (stating that HB-Nevada's only domestic warehouse is in Missouri).

14      For purposes of determining venue, residency of a business entity is coextensive

15  with personal jurisdiction over such entity.  _See_ 28 U.S.C. § 1391(c)(2).  Neither side

16  contends that HB-Nevada is subject to _general_ jurisdiction in Washington.  Defendants,

17

18  ――――――――――――――――

19  [4] HB-Washington is wholly owned by Brian Wright, who is a Washington citizen.  _See_ Defs.'
Corp. Disclosure Statement (docket no. 61); _see also_ Am. Compl. at ¶ 4 (C15-615, docket no. 7).

20  [5] Brian Dunn is an independent contractor employed by HB-Nevada.  Dunn Decl. at ¶ 1 (docket
no. 89).  He was designated to testify as HB-Nevada's designee pursuant to Federal Rule of Civil

21  Procedure 30(b)(6).  _Id._ at ¶ 2; _see also_ Dunn Dep. at 8:4–10, Ex. D to Kanter Decl. (docket
nos. 88-4 & 95).  Dunn resides in Tecumseh, Ontario, Canada and works out of his home.  Dunn

22  Dep. at 6:12–21 (docket nos. 88-4 & 95).

23

ORDER - 3

1  however, assert that HB-Nevada has sufficient "minimum contacts" with Washington to

2  support *specific* personal jurisdiction.  *See* Int'l Shoe Co. v. Washington, 326 U.S. 310,

3  316 (1945) ("due process requires . . . certain minimum contacts with [the forum] such

4  that the maintenance of the suit does not offend 'traditional notions of fair play and

5  substantial justice'").  wedi disagrees, and so does the Court.

6  **A.      Specific Personal Jurisdiction**

7        Specific jurisdiction is analyzed under a three-prong test:  (1) whether the non-

8  resident defendant either (a) purposefully directed activities toward or consummated a

9  transaction with the forum or a resident thereof, or (b) purposefully availed itself of the

10  privilege of conducting activities in the forum, thereby invoking the benefits of its laws;

11  (2) whether the claim[6] at issue arises out of or relates to the defendant's forum-related

12  activities; and (3) whether the exercise of jurisdiction would "comport with fair play and

13  substantial justice" or, in other words, be "reasonable."  *See* Schwarzenegger v. Fred

14  *Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  Although discussed in tandem,

15  purposeful direction and purposeful availment are distinct concepts; the former is

16

17

18  _____

[6] In this action, wedi has pleaded two claims:  (i) false advertising in violation of the Lanham
19  Act; and (ii) consumer fraud in violation of Nevada Revised Statute ("NRS") 41.600.  *See*
    Compl. at ¶¶ 39–51 (docket no. 1).  The situs of wedi's claim pursuant to NRS 41.600 is Nevada,
20  not Washington; the operative pleading alleges that defendants "engaged in consumer fraud" in
    violation of the Nevada statute "when, *in the State of Nevada*, [they] engaged in deceptive trade
21  practices."  *See* Compl. at ¶ 49 (docket no. 1) (emphasis added).  Defendants make no assertion
    that the consumer fraud claim under NRS 41.600 arises out of or relates to any of HB-Nevada's
22  dealings in or aimed at Washington.  Thus, the Court considers any forum-related activities only
    as they relate to wedi's Lanham Act claim.

23

ORDER - 4

1  "most often used in suits sounding in tort," while the latter is typically applied when the

2  litigation involves a contract.  *Id.*

3       When, as here, an intentional tort is the basis for alleging specific jurisdiction,

4  purposeful direction or availment is evaluated under the three-part "effects" standard

5  derived from *Calder v. Jones*, 465 U.S. 783 (1984).  *See Dole Food Co. v. Watts*, 303

6  F.3d 1104, 1111 (9th Cir. 2002).  The "effects" inquiry asks whether the defendant

7  (i) committed an intentional act, (ii) expressly aimed at the forum, and (iii) causing harm

8  that the defendant knew was likely to be suffered in the forum.  *Schwarzenegger*, 374

9  F.3d at 803 (quoting *Dole Food*, 303 F.3d at 1111); *see also Harris Rutsky & Co. Ins.*

10 *Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1131 (9th Cir. 2003).  All three parts

11 of the "effects" test must be satisfied to establish the requisite purposeful direction or

12 availment with respect to the related intentional tort.  *See Schwarzenegger*, 374 F.3d at

13 805.

14      Notwithstanding their citation to *Harris Rutsky & Co.*, defendants fail to mention

15 or analyze in their supplemental briefing any of the three components of the "effects"

16 test.  Defendants instead provide a "non-comprehensive" list of HB-Nevada's activities,

17 which they argue constituted "targeting this District," namely:  (i) owning and

18 maintaining a website; (ii) announcing on the website that one of four related offices is

19 located in Washington; (iii) developing content for the website, including marketing

20 statements; (iv) advertising on the website various training sessions, including in-person

21 trainings conducted in Washington before this action commenced in Nevada in

22 March 2022; (v) providing an interactive map on the website, along with information

23

ORDER - 5

1 about dealers, retailers, and distributors by location, including Washington; (vi) selling

2 products to HB-Washington; and (vii) developing and providing marketing materials to

3 dealers, retailers, and distributors, including those in Washington.  <u>See</u> Defs.' Supp. Br. at

4 3–4 (docket no. 91).  Each of these enumerated actions are intentional and therefore

5 satisfy the first part of the "effects" standard, but the Court concludes that none of them

6 meet the second (expressly aimed at the forum) element for the reasons discussed in the

7 next three sections.

8 **B. <u>Website (www.hydroblok.com)</u>**

9   The first five of the seven activities defendants list in their supplemental brief

10 involve the website "www.hydroblok.com."  As a matter of law, the operation of a

11 passive website, which merely makes information available to visitors, does not

12 demonstrate "express aiming."  <u>See</u> <u>Herbal Brands, Inc. v. Photoplaza, Inc.</u>, 72 F.4th

13 1085, 1091 (9th Cir. 2023).  Moreover, maintaining an interactive website, through which

14 "users can exchange information with the host computer," does not itself establish

15 "express aiming."  <u>Id.</u>  Rather, "express aiming" requires "something more" than merely

16 operating an interactive website; the "something more" might be a forum-specific focus

17 (<u>e.g.</u>, celebrity gossip involving the "California-centric entertainment industry") or

18 content exhibiting an intent to cultivate an audience within the forum.  <u>Id.</u> at 1091–92.

19 The "something more" might also consist of a sale of a physical product via the

20 interactive website that causes the product to be delivered to the forum, provided that

21 (i) the sale occurred as part of the defendant's regular course of business rather than for a

22 "random, isolated, or fortuitous" reason, and (ii) the defendant exercised "some level of

23

ORDER - 6

1    control over the ultimate distribution of its products beyond simply placing its products

2    into the stream of commerce." _Id._ at 1093–94.

3        Defendants offer no basis for concluding that www.hydroblok.com was anything

4    other than a passive website when this lawsuit began on March 14, 2022.  Although the

5    website currently includes an "Order Online" tab via which consumers may purchase

6    Hydro-Blok products from a vendor known as Menards, defendants have not specified

7    the date on which the "Order Online" tab was added as a feature.  _See_ Dunn Dep. at

8    25:19–26:11 & 30:9–16, Ex. D to Kanter Decl. (docket nos. 88-4 & 95).  In contrast,

9    wedi has provided screen shots of the website as it appeared on or shortly before

10   March 14, 2022, which are available from the Wayback Machine (www.archive.org),

11   showing www.hydroblok.com did not have, at the relevant time, a feature that allowed

12   users to purchase products.  _See_ Kanter Decl. at ¶¶ 7–14 & Exs. F–L (docket nos. 92 &

13   92-6 – 92-12) (indicating that the earliest day on which the "Order Online" tab appeared

14   on the website was July 14, 2022).  Thus, the only conclusion supported by the record is

15   that www.hydroblok.com was a passive website, which cannot serve as the basis of

16   specific personal jurisdiction over HB-Nevada or any other entity that owned, developed,

17   maintained, created content for, or posted announcements or advertisements to it.

18       Even if www.hydroblok.com were considered an interactive website, the requisite

19   "something more" that would warrant relying on the website to find "express aiming" has

20   not been shown.  No evidence has been provided that, before this action commenced, any

21   sale of a physical product occurred via the website as part of HB-Nevada's regular course

22   of business.  Although HB-Washington has been described as HB-Nevada's "largest

23

ORDER - 7

1    customer," and HB-Washington allegedly "purchases essentially all of its Hydro-Blok

2    product inventory" from HB-Nevada, *see* Dunn Decl. at ¶¶ 12–13 (docket no. 89), the

3    record does not reflect any link between these supplier-to-distributor transactions and the

4    website at issue.  No showing has been made that any sales between HB-Nevada and

5    HB-Washington were consummated by interacting with or through www.hydroblok.com.

6          In addition, as of March 14, 2022, the website lacked the type of Washington-

7    specific focus or content that would constitute the "something more" on which personal

8    jurisdiction could be premised.  As indicated in the screen shots submitted by wedi,

9    www.hydroblok.com offered the same information to users regardless of where they were

10    located.  Exs. G–L to Kanter Decl. (docket nos. 92-7 – 92-12).  The website touted the

11    benefits of Hydro-Blok products, comparing the Hydro-Blok shower system favorably

12    over "traditional shower installs," and offered links to YouTube "how to" videos.  *See id.*

13    at Exs. G, K, & L (docket nos. 92-7, 92-11, & 92-12).  The website also indicated that

14    sales and product development offices were located in North America, but manufacturing

15    and research and development occurred in China, *id.* at Ex. H (docket no. 92-8), and it

16    listed by name and email address various sales representatives for different areas, *id.* at

17    Ex. I (docket no. 92-9).

18          Although Washington was among the numerous regions mentioned, it was not the

19    focus of the information on the website, which had a nationwide scope with respect to

20    both the United States and Canada.  *See id.* (identifying ten sales representatives for states

21    west of and including Missouri and Arkansas, eight salespersons for states in the Midwest

22    and eastern part of the United States, and five agents for the Canadian provinces).  The

23

ORDER - 8

1  same is true of the website's interactive map for finding a dealer or retailer; this feature

2  was not at all tailored to Washington, but rather allowed users to enter any "zip/postal

3  code." *See id.* at Ex. J (docket no. 92-10).  Finally, the information provided on the

4  website about the related companies

5  undermines, rather than supports, defendants'

6  position about personal jurisdiction over

7  HB-Nevada.  The website indicated that the

8  head office, which handled "EASTERN USA,"

9  was located in Nevada and had a domain name

10 of "hydroblok.com."  *See id.* at Ex. I (docket

11 no. 92-9) (reproduced at left).  The website

12 also advised users seeking assistance in the

13 "WESTERN USA," which includes

14 Washington, to contact HB-Washington,

15 which had a separate domain name, namely

16 "hydroblokusa.com."  *Id.*  Contrary to defendants' assertion, this portion of the website

17 cannot be understood as announcing that "one of only four principal offices" of HB-

18 Nevada was located in Washington.  *See* Defs.' Supp. Br. at 3 (docket no. 91).  Rather,

19 the website displayed a phone number and an email address for three different, but

20 related entities, as well as the physical address (in Washington) for just one of those three

21 companies, which was *not* HB-Nevada.  *See* Ex. I to Kanter Decl. (docket no. 92-9); *see*

22

23

ORDER - 9

1   *also* Ex. B to Dunn Decl. (docket no. 89-2).  In sum, the website "www.hydroblok.com"

2   does not satisfy the "expressly aimed at the forum" element of the "effects" test.

3   **C.        Supplier-to-Distributor Transactions**

4          With respect to the sixth type of contact with Washington on which defendants

5   attempt to rely, the parties debate what evidence is required.  Defendants rely heavily on

6   the declaration of HB-Nevada's independent contractor Brian Dunn, who has represented

7   that "[a]ll sales of Hydro-Blok products in the United States, including Washington State,

8   are made *through* Hydroblok-Nevada."  Dunn Decl. at ¶ 11 (docket no. 89) (emphasis

9   added).  In his declaration, Dunn explained that HB-Washington is the "principal

10  distributor of Hydro-Blok products in Washington," purchasing "essentially all of its

11  Hydro-Blok product inventory from Hydroblok-Nevada," and that all retailers and other

12  distributors of Hydro-Blok products in Washington purchase their inventory from HB-

13  Washington.  *Id.* at ¶ 12.  Dunn relied on these vertical, supply-chain relationships to

14  opine that product sales in Washington are "consummated by Hydroblok-Nevada."  *See*

15  *id.*  Importantly, however, Dunn never stated in his declaration that sales in Washington

16  are made "*by*" HB-Nevada, and what Dunn seemed to describe is a supplier-distributor

17  relationship between HB-Nevada and HB-Washington.

18         wedi disputes the existence of such supplier-distributor relationship for three

19  reasons.  First, wedi argues defendants should be bound by their previous representation

20  to the Court that HB-Canada, not HB-Nevada, sells Hydro-Blok products to HB-

21  Washington.  *See* Pl.'s Supp. Br. at 9–10 (docket nos. 88-1 & 90) (citing Defs.' Resp. at 8

22  (docket no. 62)).  Second, wedi offers, as evidence negating a supplier-distributor

23

ORDER - 10

1   relationship, an agreement between HB-Nevada, HB-Washington, and a Chinese entity

2   referred to as "The Factory," pursuant to which HB-Washington has been assigned the

3   sales territory known as the "Mississippi East 19 states," which includes Washington, and

4   HB-Washington is supplied shower-system products by The Factory (not by HB-

5   Nevada).  *See* *id.* at 9 (citing Ex. M[7] to Kanter Decl. (docket no. 97)).  Finally, wedi asks

6   the Court to conclude that the alleged transactions did not occur because no invoices,

7   purchase orders, bills of lading, or other similar documentation of product sales by HB-

8   Nevada to HB-Washington have been produced in discovery.  *See* *id.* at 10.[8]

9       In response, defendants assert that HB-Nevada and HB-Canada "are the same

10  operative entity."  Defs.' Rebuttal Br. at 4 (docket no. 103).  Defendants reason that

11

12  _____

13  [7] Although this agreement was filed under seal, the information set forth above is substantially
    duplicative of what is publicly available on the website (www.hydroblok.com), which directs
    potential purchasers in Washington to contact HB-Washington or its sales representatives, *see*
14  Ex. I to Kanter Decl. (docket no. 92-9), and thus, no reason exists for sealing this Order.  The
    arrangement described in the agreement is also corroborated by Dunn's testimony that customers
15  in Washington buy Hydro-Blok products from either HB-Washington or a distributor, and that
    HB-Nevada has no sales representatives who live in Washington.  *See* Dunn Dep. at 59:21–60:3
16  & 83:9–12, Ex. D to Kanter Decl. (docket nos. 95 & 107-3).

17  [8] In a discovery response, HB-Nevada stated that it also imports Hydro-Blok products into the
    United States, including into the Western District of Washington.  Defs.' Supp. Resp. to Interrog.
18  No. 1, Ex. C to Kanter Decl. (docket nos. 88-3, 94, & 107-2).  Dunn testified that HB-Nevada
    imports materials into different shipping ports, including Tacoma, Washington.  Dunn Dep. at
19  99:25–100:10, Ex. D to Kanter Decl. (docket nos. 88-4 & 95).  wedi indicates that HB-Nevada
    has produced no records to support this representation.  *See* Pl.'s Supp. Br. at 8 (docket nos. 88-1
20  & 90).  The Court agrees with wedi that defendants' failure to disclose any of the standard
    documents required for importing merchandise into the United States warrants an inference that
    such customs records would be unfavorable to HB-Nevada.  *See* *Singh v. Gonzales*, 491 F.3d
21  1019, 1024 (9th Cir. 2007) (quoting *Int'l Union, UAW v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir.
    1972) ("when a party has relevant evidence within his control which he fails to produce, that
22  failure gives rise to an inference that the evidence is unfavorable to him")).

23

ORDER - 11

1   HB-Canada is "wholly owned" by HB-Nevada and "has not operated as a separate entity

2   since 2019."  For support, defendants provided the Central Securities Register for

3   HB-Canada, which indicates that HB-Canada's Class A, Class B, and Class C shares are

4   owned by an entity in Milpitas, California.  *See* Ex. A to Dunn Decl. (docket no. 101).

5   Defendants have not explained how such California entity is related to HB-Nevada.  Even

6   if, however, HB-Nevada owns 100% of the shares of HB-Canada, defendants have not

7   made the showing necessary to pierce the corporate veil of either company.[9]  Thus, the

8   Court will not impute to HB-Nevada the activities of HB-Canada that might have been

9   expressly aimed at Washington.

10          Defendants have offered no explanation for why records evidencing sales from

11   HB-Nevada to HB-Washington were not provided to wedi or filed with the Court.

12   Defendants appear to have misconstrued the Court's ruling on wedi's motion to compel

13   as relieving them of any obligation to produce and present relevant documents.  In

14   suggesting that Dunn's testimony alone is sufficient to demonstrate HB-Nevada's

15

16

17   [9] Under Washington law, to ignore the corporate form, it "must be intentionally used to violate or evade a duty" and disregard of the corporate form "must be necessary and required to prevent unjustified loss to the injured party."  *Cal. Expanded Metal Prods. Co. v. Klein*, 426 F. Supp. 3d

18   730, 753–54 (W.D. Wash. 2019).  Piercing a corporation's veil in Nevada requires that (i) the corporation be influenced and governed by the stockholder asserted to be its alter ego, (ii) such

19   unity of interest and ownership exist that the corporation and stockholder are inseparable, and (iii) adherence to the corporate fiction would sanction fraud or promote manifest injustice.  *Basic Mgmt. Inc. v. United States*, 569 F. Supp. 2d 1106, 1117 (D. Nev. 2008).  The Ninth Circuit's

20   alter ego test considers (a) the amount of respect given to the separate identity of the corporation by its shareholders, (b) any fraudulent intent in forming the corporation, and (c) the degree of

21   injustice visited on the litigants by recognition of the corporate entity.  *See id.* at 1118 (citing *Ministry of Defense of Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 769–70 (9th Cir.

22   1992)).

23

ORDER - 12

1  purposeful direction or availment, defendants quote the following passage of the Minute

2  Order entered July 28, 2023:  "Plaintiff will not . . . be heard to complain that personal

3  jurisdiction has not been established simply because defendants did not disclose more

4  information than was necessary to establish the requisite contacts with the forum."  *See*

5  Defs.' Rebuttal Br. at 4 (docket no. 103) (quoting Minute Order at ¶ 2 (docket no. 87)).

6  This verbiage, however, must be understood in the context of a preceding sentence,

7  which observed that defendants, "who wish for this action to proceed in this District,

8  have every incentive to provide to plaintiff the interrogatory responses, documents, and

9  testimony on which they will rely in attempting to show that [HB-Nevada] has sufficient

10  contacts with Washington to support . . . personal jurisdiction."  Minute Order at ¶ 2

11  (docket no. 87).  Given defendants' strong desire to litigate this matter in this Court, their

12  failure to proffer sales records must be viewed as reflecting that such materials either

13  do not exist or do not support their position.  Having considered the terms of the

14  agreement between HB-Nevada, HB-Washington, and The Factory, as well as

15  defendants' inconsistent representations regarding which entity supplies products to

16  HB-Washington and the absence of documentation that HB-Nevada would be expected to

17  possess if it transacted business with HB-Washington, the Court reaches the only possible

18  conclusion, namely that defendants have not shown HB-Nevada imported, sold, or

19  distributed Hydro-Blok products in Washington before this litigation commenced.

20  / / /

21  / / /

22  / / /

23

ORDER - 13

**D.**      **Marketing Materials**

Turning to the last activities on defendants' list, which are unquestionably

related[10] to wedi's Lanham Act claim seeking damages and injunctive relief for allegedly

false or misleading statements concerning the certification of Hydro-Blok products by the

International Code Council Evaluation Service ("ICC-ES"), the Court is similarly

unpersuaded by defendants' efforts to establish personal jurisdiction.  Defendants

contend that HB-Nevada played a role in both (i) the ICC-ES certification process, and

(ii) the development and distribution of marketing materials containing the challenged

"ICC-ES certified" statement.

With regard to the ICC-ES certification process, defendants do not explain how

such activities were expressly aimed at Washington.  The ICC-ES is located in

California, *see* Ex. O to Kantor Decl. (docket nos. 88-7, 99, & 107-6), and the ICC-ES

certification is not in any sense specific to Washington.  The "ICC-ES certified"

representation is set forth on the website, which is viewable nationwide.  *See*, *e.g.*, Ex. H

to Kantor Decl. (docket no. 92-8).  Moreover, correspondence from the ICC-ES while

---

[10] In contrast to marketing activities, product sales by HB-Nevada (either on its own behalf or as
the alleged alter ego of HB-Canada) to HB-Washington are contacts with the forum that wedi
contends are unrelated to its Lanham Act claim and cannot form the basis for exercising specific
personal jurisdiction.  *See Schwarzenegger*, 374 F.3d at 802 (indicating that the claim as to
which specific personal jurisdiction is asserted must arise out of or relate to the defendant's
forum-related activities).  According to wedi, the false or misleading nature of the statements at
issue must be measured vis-à-vis Hydro-Blok customers, and not in relation to intra-corporate-
family dealings.  The Court does not adopt wedi's analysis because the underlying product sales
have not been shown and, to the extent that such sales did occur, wedi would likely have wished
to base its calculation of damages on them, rendering them sufficiently related to the Lanham
Act claim to meet the second prong of the specific jurisdiction standard.

ORDER - 14

1  this action has been pending, as well as before the lawsuit began, was directed to HB-

2  Canada, not HB-Nevada.  *See* Ex. O to Kantor Decl. (docket nos. 88-7, 99, & 107-6); *see*

3  *also* Ex. F to Dunn Decl. (docket no. 89-6).  In his declaration, Dunn states that the

4  ICC-ES erred in communicating with HB-Canada, rather than HB-Nevada, and that he

5  has asked the ICC-ES to "correct the name of the applicant," but he does not indicate

6  when he made such request or if he received any response.  Dunn Decl. at ¶ 16 (docket

7  no. 89).  Defendants simply have not shown that HB-Nevada was responsible for

8  obtaining the ICC-ES certification during the timeframe relevant to this matter or that any

9  actions in doing so were expressly aimed at Washington.

10        As to marketing materials making "ICC-ES certified" representations, defendants

11  fail to distinguish between development and dissemination.  According to Dunn,

12  HB-Nevada "often works directly with" HB-Washington to develop marketing materials

13  and provide them to dealers, retailers, and distributors in Washington.  *Id.* at ¶ 14.  This

14  testimony is too vague to establish any purposeful direction or availment.  HB-Nevada's

15  development efforts necessarily occurred outside Washington given that HB-Nevada has

16  no office or employees within the state.  And, those development efforts cannot be

17  considered "expressly aimed" at Washington because the marketing materials were

18  intended to be disseminated, and were related to products distributed, throughout the

19  United States and Canada.

20        With respect to any actions that HB-Nevada might have taken to disseminate

21  marketing materials in Washington, Dunn's declaration offers no details.  Dunn merely

22  refers to an exhibit that he describes as "one example of an instance when Hydroblok-

23

ORDER - 15

Nevada prepared such marketing materials and delivered them to Hydroblok USA." _Id._

The referenced exhibit is an email that Dunn sent to Brian Wright and Kurt Hodson at

HB-Washington, attached to which was a "simple brochure" created by someone named

Chris, with whom Wright had previously worked on developing a prior draft.  _See_ Ex. E

to Dunn Decl. (docket no. 89-5).  In other words, the email reflects that HB-Washington,

not HB-Nevada, was responsible for developing the brochure, and the graphic design

work was performed by a person whose location and relationship to either company has

not been disclosed.  More importantly, no evidence has been provided that this "simple

brochure" was ever professionally printed or provided to customers, dealers, retailers, or

distributors in Washington or elsewhere.  At most, the exhibit shows that HB-Nevada and

HB-Washington corresponded via email.  This virtual contact might support specific

personal jurisdiction for a related dispute between HB-Nevada and HB-Washington, but

it does not establish the purposeful direction or availment necessary to conclude that

HB-Nevada is a "resident" of this forum within the meaning of the venue statute.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)    wedi's motion to retransfer this case to the District of Nevada, docket

no. 57, is GRANTED.

(2)    The Clerk is directed to TRANSFER this matter to the District of Nevada,

to administratively CLOSE this case, and to send a copy of this Order to all counsel of

record.

ORDER - 16

1    IT IS SO ORDERED.

2    Dated this 9th day of November, 2023.

3

4    _____

5    Thomas S. Zilly
     United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER - 17